## YAGER, Respondent, v. BRUCE, Appellant.

St. Louis Court of Appeals, January 30, 1906.

1. **LIBEL AND SLANDER: Privileged Communication: Express
Malice.** In an action for slander, where there was evidence to
show that the defamatory words were spoken with actual mal-
ice, that question was properly submitted to the jury, though
the communication enjoyed a qualified privilege.

Yager v. Bruce.

2. ——: ——: Candidate for Office. Defamatory words which are themselves actionable are sometimes privileged by the social relations and duties of those who utter them. This applies to fairminded discussions of the merits and demerits of candidates for public office; the utterance of slanderous words in such case will not raise the presumption of malice, but the speaker will be held only in case the evil motive is proved.

3. ——: ——: ——. But where one charged a candidate for office with a crime and did so in the form of a vituperative epithet and not merely as an expression of opinion, the statement was not entitled to the benefit of a qualified privilege, but was actionable if untrue.

4. ——: Imputing Crime: Possession of Stolen Goods. In an action for slander where the slanderous words charged the plaintiff with being a thief and the defendant answered justifying the charge, evidence that a stolen article was four years afterwards found in possession of the plaintiff would not raise the presumption of guilt so as to sustain the plea of justification.

5. ——: Proof of Words Charged: Instruction. In an action for slander, an instruction which authorized a verdict for plaintiff if the jury believed the defendant spoke the words charged "in substance," was cured by another instruction which explicitly required the jury to find that the identical words charged were proven and told them that the proof of words of similar import would not be sufficient.

6. ——: Justification: Mitigation. Under section 636, Revised Statutes of 1899, the defendant in an action for slander or libel may in his answer allege the truth of the defamatory statements and also any circumstances in mitigation of damages.

7. ——: ——: Privileged Pleading. The rule that all allegations in pleadings are absolutely privileged does not apply to the answer of a defendant in a slander or libel case. In such a case if the answer avers the truth of the defamatory words, the jury may consider the good faith or malice of the plea in determining the amount of plaintiff's damages.

8. ——: ——: Punitive Damages: Express Malice. But the failure to sustain a plea of that kind is not of itself sufficient ground for awarding punitive damages; to award punitive damages in such case, the plea not only must be unproved, but must have been filed in bad faith.

9. : Evidence: Statement in Negotiating Compromise. In an action for slander, where a proposition for settlement was rejected by the defendant, who, at the time, repeated the defamatory words, evidence of his statement was admissible because not made pending negotiations for compromise.

10. ———: Reputation of Plaintiff: Specific Acts. In an action for slander, defendant could not, in mitigation of damages or in justification, prove specific dishonorable acts committed by plaintiff, except those pleaded in justification, or rumors of such acts.

11. ———: ———: ———. Likewise it was not permissible for a witness to state that the plaintiff was honorable in his personal dealings with the witness; nor, where the defamatory words charged larceny, was it permissible to show that the plaintiff's reputation for paying his debts and in public dealings was good or bad.

12. ———: ———: General Character. The plaintiff, who brought an action for slander, alleging defamatory words which charged him with being a thief, put his general reputation in issue thereby so that his general reputation for integrity and moral worth prior to the date of the slander was admissible.

13. ———: Evidence: Mitigation. In an action for slander, a statement of the person, to whom the slanderous words were uttered, using similar expressions regarding the plaintiff to other persons, was not admissible in evidence.

14. ———: Mitigation: Good Faith. In an action for slander, where the defamatory words alleged charged the plaintiff with being a thief, it was competent for the defendant to testify what a third person had told him tending to show the truth of the charge, for the purpose of showing that he uttered the words in good faith and was not therefore liable for punitive damages.

15. ———: Instructions: Measure of Damages. In an action for slander, the defendant can not complain of a general instruction given for the plaintiff regarding compensative and punitive damages, which left out of view the defendant's plea in mitigation, where he did not request an instruction calling the jury's attention to such plea.

Appeal from Audrain Circuit Court.—*Hon. James D. Barnett,* Judge.

REVERSED AND REMANDED.

*P. H. Cullen* and *D. A. Murphy* for appellant.

(1)   It was error to instruct the jury that they might take into consideration the falsity of the defense as an aggravation of damages.   Browning v. Powers (Mo.), 38 S. W. 943; Kansas City Star Co. v. Carlisle, 108 Fed. 344, 47 C. C. A. 384.   Upton v. Hume, 34 Ore. 420; Upton v. Hume, 21 L. R. A. 493; Sloan v. Petrie, 15 Ill. 425; Kennedy v. Houghtaling, 37 Mich. 41; Ward v. Dicko, 47 Conn. 300, 36 Am. Rep. 75; Odgers, Libel & Slanders, sec. 274.   Bliss on Code Pleading (2 Ed.), sec. 360; 18 Am. & Eng. Ency. of L. (2 Ed.), p. 1104; Cruikshank v. Gordon, (N. Y.), 24 N. E.   451; Mark v. Press Pub. Co. (N. Y.), 31 N. E. 918; Harbison v. Snook, 41 Ill. 147; Albertz v. Albertz, 78 Wis. 72, 10 L. R. A. 585; Cole v. Holliday, 4 Mo. App. 94; Broyhill v. Norton, 175 Mo. 204; Byrkett v. Monohon, 7 Blackf. (Ind.), 83; Chubb v. Flanagan, 66 Car. and P., 431; Swails v. Butcher, 2 Ind. 84; Shank v. Crove, 1 Ind. 170.   (2)  The words must be proved as charged. If the allegations and proof do not correspond there is a failure of proof and the plaintiff is fated to failure. Berry v. Dryden, 7 Mo. 324; Birch v. Benton, 26 Mo. 161; Watson v. Musick, 2 Mo. 25; Wood v. Hillbish, 23 Mo. App. 398; Christal v. Craig, 80 Mo. 374; Street v. Bushnell, 24 Mo. 329.   (3)  It is a well-settled rule that the testimony as to character must be general and not specific.   The plaintiff revoked this rule and precluded evidence of specific acts of delinquency on plaintiff's part but broke it for his own benefit and forced witnesses to testify as to specific acts and dealings of plaintiff which redounded to his credit.   Moulton v. State, 88 Ala. 116, 6 L. R. A. 301; Engleman v. State, 2 Ind. 91, 52 Am. Dec. 494; State v. Gordon, 3 Iowa 410; State v. McGee, 81 Iowa 17, 46 N. W. 764; State v. McDonald, 57 Kas. 537; Keomly v. State, 68 Miss. 233; Hussey v. States, Ala. 121. (4) Admissions made pending compromise is not admissible,

Yager v. Bruce.

hence eror was committed in overruling objecions to witness Baker's testimony. Elliott on Ev., sec. 240; Columbia etc. v. Ins. Co., 59 Mo. App. 205; Herman v. Railway, 77 Mo. App. 377. (5) We suggest that the doctrine of "qualified privilege" is involved in this case. The utterance complained of by the respondent is a qualifiedly privileged communication and the plaintiff must prove express malice before he can recover punitive damages. On the general law of this subject this court has recently added a very valuable contribution. Kersting v. White, 107 Mo. App. 265, 80 S. W. 730; Finley v. Steele, 159 Mo. 299, 60 S. W. 108; Bogs v. Hunt, 60 Iowa 251, 14 N. W. 785; Mott v. Dawson, 46 Iowa 533; State v. Balch, 31 Kansas 465; Wagner v. Scott, 164 Mo. 289 63 S. W. 1107.

*George Robertson* for respondent.

(1) There is no variance between the words charged and the proof. Birch v. Benton, 26 Mo. 153; Estes v. Antrobus, 1 Mo. 198; Cooper v. Marlow, 3 Mo. 189; Noeninger v. Voght, 88 Mo. 589; Pennington v. Meeks, 46 Mo. 217; Lewis v. McDaniel, 82 Mo. 577. (2) The court did not err in admitting the testimony of John F. Baker as to the conversation had with Bruce. It was in no sense an effort to compromise, Baker represented nobody but himself in the matter, he only undertook to talk to Bruce of making some disposition of the case. That conversation does not bring the case within the rule announced in Herman v. Railroad, 77 Mo. 377; Lanius v. Druggist, Pub. Co., 22 Mo. App. 12. (3) Appellant under his point 8 complains that the witness Sharp was not allowed to state his conversation with the defendant at the time Sharp claims he informed defendant of the five dollar bank transaction. This conversation had between Sharp and defendant was not admissible. Buckley v. Knapp, 48 Mo. 152; Newell on Slander and Libel, 887, and authorities there cited. Jones v. Murry, 167 Mo. 25, 48, 66 S.

W. 981. (4) The plea of justification, if persisted in but not proven, will enhance the damages. Newell on Slander and Libel (2 Ed.), 883 and authorities cited under note 5. Warwick v. Foulks, 12 M. & W. 508; Wilson v. Robinson, 7 Q. B. 68; Simpson v. Robinson, 12 Q. B. 511; Robinson v. Drummond, 24 Ala. 174; Pool v. Devers, 30 Ala. 672; Dowling v. Brown, 3 Col. 571; Henderson v. Fox, 83 Ga., 233; Jackson v. Stetson, 15 Mass. 48; Gorman v. Sutton, 32 Pa. 247; Burkhalter v. Coward, 16 S. C. 435; Wilson v. Nations, 5 Yerg. 211; Faucitt v. Booth, 31 Up. Can. Q. B. 263; Cavanaugh v. Austin, 42 Vt. 576; Marker v. Dun, 68 Ia. 720.

GOODE, J.—Plaintiff obtained judgment against the defendant for a slander on a verdict awarding $200 actual damages and $800 punitive. The slander alleged was that defendant, on April 5, 1904, in speaking of the plaintiff, who was at that time seeking the Democratic nomination for assessor of Audrain County, said that any man who voted for plaintiff would vote for a "thief," and further that plaintiff was a "thief," a profane epithet being prefixed to the word. Besides denying that he spoke the slanderous words, defendant justified by averring their truth and in support of the averment charged plaintiff with two specific thefts; namely, stealing a wrench of the value of $1.00 from A. J. McCully in 1893 and stealing $5.00 in money on January 11, 1896 from the Mexico Savings Bank, a corporation engaged in banking in the city of Mexico, Missouri. Following the general denial and the plea of justification, the answer contained a plea in mitigation of damages of which the purport was, that whatever words defendant may have uttered concerning plaintiff, were spoken in good faith, without actual malice and related to acts and conduct of plaintiff generally rumored and believed to be true by the persons to whom the defendant spoke and by the inhabitants of the neighborhood where plaintiff lived; that at the time laid as the date of the utterance, plain-

tiff's reputation for honesty and fair dealing was bad in the community where he resided, and the alleged slanderous charge was believed by the public to be true before defendant is said to have uttered it; that the person to whom defendant is said to have spoken, had previously told the defendant and many other persons that plaintiff was dishonest and had been guilty of theft and other offenses against the law; that whatever defendant may have stated, was a repetition of part of what had long before been imparted to him concerning the plaintiff, and this fact was well known to the person to whom defendant is said to have uttered the charge. A replication was filed to put in issue the special defenses pleaded in the answer.

The person to whom the defendant spoke the slander laid in the petition, if he spoke it at all, was Thomas J. Gatewood, an elderly man living in the country neighborhood where plaintiff and defendant resided. Gatewood and his wife both swore that on April 5, 1904, defendant said to Gatewood that plaintiff was a thief; but the defendant and his brother, who was present at the time of the conversation, testified unequivocally to the contrary. The circumstances were these: All the parties to the conversation had attended a school meeting at the Gatewood schoolhouse in Audrain county. On their return home, defendant's brother, Porter Bruce, and Gatewood traveled together until they reached Gatewood's home, which lay between the schoolhouse and the homes of the Bruces. As we gather from the testimony, someone had started a rumor that Gatewood had agreed with Yager for a valuable consideration, to vote for the latter in the primary. A conversation began at the schoolhouse between Porter Bruce and Gatewood about Yager's candidacy, in the course of which Gatewood denied the selling of his vote and attempted to explain the transaction which gave rise to the charge. Porter Bruce opened the interview by asking Gatewood if he was going to vote for Yager, and said the latter was a

thief and a boodler. The epithet "boodler" had reference to the supposed buying of Gatewood's vote and led to the explanation. The conversation continued in a desultory way as they went to their homes; but the defendant, Frank Bruce, appears to have taken little or no part in it. When the parties reached Gatewood's residence, the latter turned into his yard and the Bruces proceeded toward their home. They had gone about fifty yards on their way, when the defendant turned his horse around in the road, so that he could look toward Gatewood and said "Hello! I can prove that you sold your vote for twelve dollars. If you vote for Jim Yager, you vote for a damned thief." Two or three other witnesses swore defendant made the same accusation against plaintiff to them. The conversation that occurred between defendant, his brother and Gatewood, according to the testimony of the two brothers related to the fitness of Yager for the officer of assessor and to the characters of other aspirants for county offices. Frank and Porter Bruce swore the former took no substantial part in the discussion, which was between Porter Bruce and Gatewood. They both swore positively that Frank Bruce applied no epithet to Yager and cast no aspersion on his character. Their version of the remark about Yager being a thief is, that Gatewood, himself, in assigning reasons why he intended to support Yager, said the latter was no thief as some persons accused him of being.

An exception to the testimony of John F. Baker was preserved. The objection urged against the reception of this testimony was that it showed the remark Baker swore defendant made about plaintiff, occurred during an attempt to compromise the case at bar. What was proved on the *voir dire* of Baker was that he and a man named Turley conceived the notion that they could get the litigation settled and, with this object in view, approached defendant on the subject. They acted voluntarily, having said nothing to Yager about their in-

tention to try to induce a compromise. They wished to procure from Bruce a proposition looking to a settlement and submit it to Yager. Bruce understood that Baker and Turley were endeavoring to bring about an adjustment, but was not told whether or not Yager had authorized them to mediate. Bruce said he had a case which he was justified in carrying through and that Yager was a thief and he could prove it, or was going to prove it.

William Wilfley was permitted, over the objection of the defendant, to testify that he had lived near plaintiff all his life and had dealings with him, and all the dealings had been straight and satisfactory. In the cross-examination of this witness, he was asked what Gatewood had stated to him regarding the honesty and integrity of the plaintiff, prior to the time of the alleged slanderous utterance by the defendant to Gatewood. The answer to this question was excluded and the defendant saved an exception to its exclusion.

While the defendant was on the stand, he was asked what he had heard before the date of the alleged slander concerning the transaction between Yager and the Mexico Savings Bank in which Yager was said to have stolen five dollars. The witness said he had heard of the transaction from William Sharp; but the court refused to permit him to tell what Sharp had said, and an exception was saved to the exclusion of this testimony.

The proof of the theft of the monkey wrench was substantially as follows: A. J. McCully lived in the same neighborhood with Yager for fourteen years and, while living there, lost some personal property including a wrench. This happened twelve years before the trial of the present case. McCully had been to Paris, Missouri, one day and on his return home in the evening, missed the wrench and the other articles, from a corn crib in which he had left them. Four years afterwards, McCully's son traded a mare to Yager for a binder, and

the two McCullys swore the wrench was discovered in the box of this binder. According to Yager's testimony, he had not used the binder for two years before he traded it to Frank McCully, but it had been standing in a field owned by Dick Bruce and was there at the time McCully traded for it. As to what relationship, if any, Dick Bruce bore to the defendant, there was no proof. Yager swore he knew nothing about the wrench or how it got into the box of the binder, and that he had never heard of the theft of it until some depositions were taken in the present case.

Th following is the substance of the testimony concerning the alleged theft of five dollars from the Mexico Savings Bank. In January, 1896, a firm of horse dealers by the name of Clayton Brothers was buying horses in Mexico, Missouri. Yager sold them a span of mules for $140, and they gave him in payment a check on the Mexico Savings Bank. According to the testimony, of William Sharp and Clarence Berry, they went with Yager to the bank, where he cashed the check and asked them to count the money he received on it. They did so and found that the cashier by mistake had paid Yager $145 instead of $140, the amount of the check. Yager said $145 was the price of the mules, and that the bank was able to lose the five dollars and kept the whole sum. There was some testimony going to show that the bank was short of cash at the close of that day (January 11, 1896) to the amount of fourteen dollars and twenty-five cents. But as we understand the testimony of the cashier of the bank, the discrepancy between the amount of cash on hand and the books was cleared up the next day and it then appeared that there had been no shortage. Yager swore he only got the amount of the check. He denied recollecting that Sharp and Berry were with him when he collected the check, and said he had never heard of the incident until he became a candidate for assessor, seven or eight years afterwards.

Besides the two specific charges of theft pleaded in justification, there was testimony adduced tending to show that plaintiff, when a boy twelve or thirteen years old, had cut some poles out of a neighbor's timber, had stolen a curry comb and had a bad reputation for paying his debts and for fair dealing. In truth, the entire life of the plaintiff was pretty well sifted and whatever rumors against him had ever been rife, were brought into the evidence. On his behalf, testimony was introduced, tending to clear up the various charges and show that there was nothing in them which reflected on his integrity. Many witnesses testified that his reputation in the community where he lived for honesty and fair dealing was good and many that it was bad. Any other facts relevant to our decision will be stated in discussing those rulings on the instructions of which the defendant complains.

1. It is insisted by the defendant that as the plaintiff was seeking nomination to the office of assessor, his character and fitness for the position were in issue before the people and legitimate subjects of discussion; that hence anything defendant said about him enjoyed a partial privilege and the burden was on the plaintiff to prove the accusation was not made in good faith but maliciously. We suppose the request for an instruction directing the jury to return a verdict in favor of the defendant was preferred on this theory. The instruction was properly refused. Facts to prove express malice were shown and therefore the case stood for decision by the jury, even if the defense of privileged communication was available; for at the most the privilege would be qualified and not absolute. [Finley v. Steele, 159 Mo. 299, 60 S. W. 108; Kersting v. White, 107 Mo. App. 265, 80 S. W. 730.] But it is important to investigate this question of privilege in order to determine where the burden of proof rested. If a semi-privilege attached to the slander because the plaintiff was a candidate, the legal presumption of malice, which is ordinarily raised

from such an utterance as defendant is said to have made, would fail. Many social relations and duties confer on defamatory words which otherwise would constitute, in themselves, a case for damages, immunity, unless proof is given that they were inspired by malevolence instead of a sense of duty. This immunity obtains in favor of utterances made in the course of a well meaning expression of opinion about aspirants for political honors. In the interest of good government and an intelligent exercise of the suffrage, the law permits fairminded discussion by the populace and the press, of the merits and demerits of candidates for official positions. And in such instances, the usual presumption of malice from slanderous charges is not indulged; but the speaker is held responsible only on proof of an evil motive. Notwithstanding the plaintiff's candidacy, the occasion on which the defendant is said to have denounced him as a thief, excludes this case from the exception of qualified privilege and leaves the presumption of malice intact. The statement was made in the form of a vituperative epithet and not during an interchange of opinions between the defendant and Gatewood about plaintiff's fitness for the office of Assessor. It was really part of a denunciation of Gatewood for selling his vote to the plaintiff. If, from a sincere interest in the public weal, defendant had been endeavoring to convince Gatewood that plaintiff was unworthy of support, and had related the incidents pleaded in the answer, as current rumors which the defendant had good reason to believe were true, the claim of privilege would be presented in a more favorable light. There is reason for holding that a citizen who entertains a well-founded belief that an aspirant for public favor has been guilty of such offenses as the answer pleads against the plaintiff, is under the duty to inform other citizens of his belief and the source of it. Few persons in this country question the wisdom of according a large liberty of speech to the people as the chief means of purifying and preserving popular insti-

Yager v. Bruce.

tutions. But all the great privileges of the law are perverted by unscrupulous men. Freedom of contract becomes to the rapacious a means of spoliation, and freedom of speech to the malevolent, a weapon of revenge. Hence, courts are more occupied in redressing injuries done by the wrong use of fundamental rights than in enforcing those rights. A candidate for office is as much entitled to redress for the injury to his reputation and humiliation to his feelings caused by slander as anyone else; and reckless charges against public men are a prolific source of misery to them and their families. These considerations have weighed with the courts and their combined influence has moulded the law. Adjudications on the subject reveal an effort to preserve the benefit of free and fair discussion of the character and ability of men who seek office, without tolerating those excesses of abuse and calumny which are often heaped on them. In order to achieve this purpose, some measure of privilege is allowed to defamatory statements uttered in political discussions, and the heat of controversy incident to campaigns and elections is considered; for it is well known that at such times, men are accustomed to censure and criticise candidates from partisan motives rather than personal malevolence. It is difficult or impossible to prescribe a rule which will determine accurately, in all cases, the line between legitimate argument and slander and whether or not a defamatory charge against one seeking office ought to fall in the class of semi-privileged communications. The general principles to be allowed as guides to a correct judgment have been stated in many judicial opinions. Some of the cases are cited and approved in a decision by our Supreme Court, wherein the conflict of authority on this question was noticed and the doctrine deemed most salutary adopted as the law of this state. For the purposes of the present case, it suffices to say that the Supreme Court held the right to freely comment on and criticise the qualifications and character of an aspirant for office,

does not warrant specific defamatory accusations; particularly such as impute the commission of a crime. The decision was that such statements enjoy no degree of privilege and the party speaking is liable in damages unless he can affirmatively establish the truth of his assertion. [Smith v. Burrus, 106 Mo. 94.] We therefore overrule the assignment that the court below erred in denying to defendant the benefit of qualified privilege. At the request of the defendant, the court advised the jury that an aspirant for office puts his fitness, qualifications and integrity in issue and makes them a subject for comment and publication; that therefore it was defendant's right and privilege to freely criticise the acts and conduct of the plaintiff and show why he was unworthy of the support of the voters. We are of the opinion that this instruction could have been refused without error, and that there is nothing in the case to call for any advice to the jury regarding the liberty of political discussion. At the request of plaintiff, the court instructed that his candidacy did not afford the defendant any defense, and if the alleged slander was found to be untrue, he was entitled to recover, notwithstanding the right of voters to comment on the characters of candidates. The two instructions placed the law before the jury in a correct light, and if superfluous, did no harm.

2.  Complaint is made of the manner in which the jury were instructed regarding the rule of law that a person found in possession of stolen property, recently after the theft, is presumed to have stolen it and has the burden of explaining his possession. This assignment of error relates to the instructions on the issue regarding the supposed theft of the McCully wrench. In justification of the charge that plaintiff was a thief, the defendant alleged that he had stolen this wrench and adduced evidence intended to support the allegation. If the instructions on this branch of the case were erroneous, yet more erroneous, in our opinion, was the submission of the issue to the jury. No evidence was intro-

duced which tended to even remotely prove plaintiff's guilt, except that the wrench was found in the box of a binder belonging to him when Frank McCully got the binder from the defendant. But this was four years after the date of the supposed theft; and from the bare fact that the wrench was then in the box of the binder, the jury was authorized to find the plaintiff had stolen it, on the ground that the recent possession of stolen property, if unexplained, raises a presumption of guilt against the possessor. In applying this rule to the present case, an essential part of it was left out of view. The possession which raises the presumption of guilt must be recent; that is shortly after the larceny occurred. [State v. Kelly, 73 Mo. 608.] If we take into consideration the entire evidence relating to this incident, it is doubtful if the plaintiff was shown to have had possession of the wrench at all. The binder had been standing for several seasons in an open field where anyone had access to it. At any rate there can be no question that plaintiff was not proved to have had the wrench shortly after it was stolen. The mere fact that four years later it was found in his machine, was certainly insufficient to create any presumption of guilt on his part. The defendant failed to sustain his justification is so far as it depended on establishing the theft of the wrench by the plaintiff.

3. One of the errors assigned is that the court instructed the jury that it was sufficient if plaintiff had proved defendant spoke the substance of the slander laid in the petition. The instructions will not bear this interpretation. One given for the plaintiff reads that if the jury believed defendant, in speaking of plaintiff, "said in substance as follows: 'Any man who votes for Jim Yager will vote for a damned thief;' or if the defendant did, at the time and place, charge that the plaintiff was a thief and such charge was false, then it is your duty to return a verdict for the plaintiff." The words "in substance" ought to have been omitted. But in an-

other instruction the jury was told that it devolved on the plaintiff to prove by the weight of evidence the speaking of the exact language stated in the petition, or enough of it to constitute the slander; that it was not sufficient to prove different words of similar import or equivalent meaning; and if the jury found, from all the evidence, that the words uttered by the defendant were different from those laid in the petition, the verdict should be for the defendant. The instruction given for the plaintiff required a finding that defendant had uttered the essence of the slander, namely; had called plaintiff a thief; and when read in connection with the instruction given at defendant's request it was hardly possible for the jury to misunderstand the law on this point; which is that the party alleging a specific slander must prove enough of the words alleged to establish the gist of the slander, [Birch v. Benton, 26 Mo. 153; Unterberger v. Scharff 51 Mo. App. 102.]

4. The court instructed that if the charges made against plaintiff in the answer, in justification of the statement that he was a thief were found to be false, this fact might be considered as an aggravation of plaintiff's damages. Our code gives the defendant the right to allege in his answer both the truth of the matter which is defamatory and any mitigating circumstances; and though he fails to justify by proving the truth of what he said, nevertheless he may give evidence in mitigation of the damages. [R. S. 1899, sec. 636.] In this State the general rule of law is that all allegations in the pleadings which are relevant to the issues, in a cause whereof the court has jurisdiction, are absolutely privileged and, though false and maliciously published, will not support an action for defamation. [Jones v. Brownlee, 161 Mo. 258, 61 S. W. 795.] The doctrine of privileged communications rests on the law's policy of protecting persons whom the welfare of society, or the force of circumstances, compels to speak about others, from liability for what they say under this sort of moral

duress. Were the rule otherwise, fear of the consequences might induce a suppression of truths which, in the interest of justice, ought to be freely expressed. This policy is very important to the administration of the law; which can be done rightly only when every means is used to ascertain the truth. For some reason the absolute privilege which commonly pertains to pleadings, has not been accorded to the answer of the defendant in a slander or libel case. Instead, the prevalent rule is that if an answer in such a case avers the truth of the alleged slander, this plea becomes a circumstance to be considered by the jury on the question of increasing the plaintiff's damages, if they find the plea was not put into the record in good faith, but maliciously and for the purpose of gving further circulation to the original slander. This rule has been approved as consonant to the Missouri statute which allows pleas in justification and in mitigation, to be contained in one answer, but separately pleaded. [Kansas City Star Co. v. Carlisle, 108 Fed. 344; See too Upton v. Hume, 24 Ore. 420; 21 L. R. A. 493; Sloane v. Petrie, 15 Ill. 425; Proctor v. Houghtaling, 37 Mich. 41; Ward v. Dick, 42 Conn. 300.] In some jurisdictions the rule is that failure to maintain a plea justifying a slander is, in itself, an aggravation of the first wrong, without regard to the motive of the defendant in filing the plea or his reasons for believing he could sustain it. There has been no final decision of the question by our Supreme Court. It was passed on by that court in Browning v. Powers, 38 S. W. 943, 142 Mo. 322, but after an opinion had been delivered, it seems to have been withdrawn and the cause transferred to the Kansas City Court of Appeals, which tribunal was held to have jurisdiction of the appeal. [142 Mo. 322.] The first opinion was never published in the official reports, but was published in 38 Southwestern Reporter at page 943. The question before us received careful attention, as it stood for decision. After

reviewing the contradictory adjudications, the court said:

"If a plea of justification is put upon record in good faith, and the evidence shows that defendant had reasonable and probable cause to believe, and did believe, that the words spoken were true, it should not be looked at even in aggravation of damages. But if the plea is made maliciously, with a view of circulating and perpetuating the original slander, it may properly be considered by the jury in aggravating the punitive damages. Good faith in uttering falsely defamatory words does not mitigate the actual damages done; but, as punitive damages are allowed on account of the malice expressed, or implied from the charge made, good faith, and want of actual malice, if the evidence tends to prove them, may properly be looked at in determining the damages to be allowed by way of punishment. Whether there was such good faith, in all circumstances, is usually a question for the jury. [Noeninger v. Vogt, 88 Mo. 589; Callahan v. Ingram, 122 Mo. 370, 26 S. W. 1020; Ward v. Dick, 47 Conn. 300; Pallet v. Sargent, 36 N. H. 499; Hawver v. Hawver, 78 Ill. 413; Byrket v. Monohon, 7 Blackf. 84.] The evidence offered by defendant tended to prove such circumstances as might reasonably have led him to believe that what he said about plaintiff was true. It is clear that, under these rules, the instruction was erroneous, in not predicating the right to consider the plea of justification as evidence enhancing the damages upon a want of good faith in filing it. The question is not whether defendant had "reasonable hope or expectation of proving the truth" of the words spoken; but whether, when he spoke them and when he filed his plea, he believed, and had reasonable grounds to believe, them to be true."

In considering the same question with reference to the effect of the Missouri statute regulating the procedure in libel and slander cases, the United States Circuit Court of Appeals for the Eighth Circuit in the case

of Kansas City Star Co. v. Carlisle (108 Fed. Reported 344), said:

"In states like Missouri, where the old rule applicable to actions of slander and libel has been modified by statute (Rev. St. Mo. 1899, sec. 636) so as to permit a plea in mitigation of damages to be filed in connection with a plea of justification, and so as to permit evidence of mitigating circumstances to be introduced, although the plea justifying the libel is not sustained, the doctrine has become well established that the failure of the defendant to maintain the latter plea is not, in and of itself, evidence of such express malice as will warrant a jury in awarding the plaintiff more than his actual damages. Whether the repetition of the libel in a plea of justification shall be regarded as evidence of actual malice, and as an aggravation of the damages, depends upon the further inquiry whether such plea was interposed in good faith, under an honest belief in its truth, or in pursuance of some ulterior and wrongful motive. And this latter issue must be determined by the jury in the light of all the facts and circumstances in evidence, and particularly in the light of all the facts and circumstances that were known to the defendant, or that ought to have been known to him, at the time he reiterated the slander. [Bush v. Prosser, 11 N. Y. 347; Hawver v. Hawver, 78 Ill. 41; Browning v. Powers (Mo. Sup.), 38 S. W. 943, 946; Uption v. Hime, 24 Or. 420, 33 Pac. 810, 21 L. R. A. 493; and other cases heretofore cited.] It is evident, therefore, that the issue respecting the motive or the good faith of the defendant, inheres in every action for slander or libel where a plea of justification is filed and is not sustained by the proof, although the issue is not formally raised by the pleadings, inasmuch as the jury, when they come to assess the damages, are entitled to determine what motive prompted the defendant to file the plea and to repeat the libelous charge."

In view of these opinions and the others we have cited, we hold that it was not ground for awarding puni-

tive damages that defendant failed to sustain his plea of the truth of the charge against plaintiff, but that for the plea to be considered for such purpose, it was essential for the jury to find, not only that it was unproved, but filed in bad faith. We think this rule is maintained by the better considered cases and is sound in principle. The opposite rule is apt to intimidate defendants in slander suits, and prevent them from making full use of their statutory privilege to plead both in justification and mitigation.

5. The testimony of the witness Baker that the defendant had stated to him that plaintiff was a thief, is said to have been wrongly admitted in evidence because made during a negotiation looking to a compromise of this case. Offers of settlement and admissions against interest, made on the faith of a treaty and in the belief that a compromise will be reached, cannot be given in evidence against the party making them. This is because the law seeks to encourage the amicable settlement of controversies and this policy would be obstructed if the parties to a lawsuit were bound by every concession or admission made in the course of a parley having in view a settlement. [1 Elliott Ev., sec. 240; 1 Greenleaf Ev. (16 Ed.), sec. 192.] The question occurs as to whether the rule is applicable to the circumstances under which defendant spoke to Baker. The plaintiff had nothing to do with the effort of Baker and Turley to bring about a compromise. They approached the defendant on their own motion, in the hope of getting a proposition from him which they could bear to Yager with the expectation that it would be acceptable to the latter; or at least open the way for a negotiation which would end in an adjustment of the controversy. The evidence before us goes to show that Bruce made no proposition for a settlement, and, instead, repelled the intervention of Baker and Turley, asserting that he had a good case and could or would prove plaintiff was a thief. In other words, he refused to enter on

Yager v. Bruce.

a treaty for the purpose of reaching a settlement; and in so doing made his language competent. [Broschart v. Tuttle, 59 Conn. 1.] In our judgment, defendant's statements to Baker could not have been excluded from the evidence, without extending the ruling against receiving admissions against interest, made in the course of a compromise treaty, beyond the precedents and further than the purpose of the rule requires. In truth, what Bruce said to Baker was no admission against interest relating to the pending case, but rather a fresh denunciation of the plaintiff and hardly within the purview of the rule invoked in any aspect of the matter. We suppose this testimony of Baker's as well as that of some other witnesses to whom the defendant made the charge, was received in evidence to prove express malice on the part of the defendant. [Newell on Slander and Libel. (2 Ed.), p. 350.]

6. (a) Much testimony was admitted for both sides as to the reputation of the plaintiff in the community where he resided for truthfulness, honesty and fair dealing. Most of this testimony was general in its nature and did not relate to specific acts, good or bad; but some of it did, and even to particular offenses against the law, and to others besides those mentioned in the answer. Testimony of particular facts was inadmissible, unless elicited by the party to whom it was unfavorable. The defendant had no right to mitigate the damages by proving that reports and rumors had been current that plaintiff had stolen poles and other things. Nor had he the right to prove specific dishonorable acts not amounting to larceny. Plaintiff's counsel might draw out such matters if he chose; or the defendant's counsel, in cross-examining the plaintiff while on the witness stand, might inquire about them. [Newell on Slander and Libel (2 Ed.), 890; Townshend on Slander and Libel (4 Ed.), sec. 407; Anthony v. Stephens, 1 Mo. 254.] No proof of any specific theft was competent, either to justify the speaking or mitigate the damages,

except those plead in the answer. The law appears to permit a defendant in a slander suit, to defend against punitive damages by proving the source of the information on which he relied in making the slanderous charge, and that he believed what he was told; thus disproving actual malice. This proposition will be referred to again.

(b)   Error occurred in permitting Wilfley to state that in his personal dealings with the plaintiff, the latter had been honest. This was establishing a good character for the plaintiff by proof of particular acts.

(c)   For the same reason, witnesses should not have been permitted to state that plaintiff's reputation for paying his debts, and fairness in business dealings, was good or bad.

(d)   We come now to the question of the admissibility of evidence touching plaintiff's general moral character; or rather his general reputation for moral worth. Is such evidence competent as affecting the compensative damages to be awarded, when the slander was not an accusation against the plaintiff's general character, as that he was dishonest, but a particular charge; namely, that he was a thief? Early cases in this state and a recent one too, impliedly hold that evidence of the plaintiff's reputation, should be in respect to the trait of character impugned by the slander. [Anthony v. Stephens, supra; Hess v. Gansz, 90 Mo. App. 439.] In the first of those cases it was said that, "When a party institutes an action of slander, he puts his general character in issue as to the crime or charge imputed to him by the defendant." In the Hess case it was said:

"The authorities all agree that proof of the bad character of the plaintiff at and before the time, of the alleged slander, is admissible in mitigation of damages whether exemplary or compensatory; but they disagree as to whether proof of the existence of a general report that the plaintiff had actually committed the particular offense of which defendant accused him, or

any similar offense, is admissible:   Odgers on L. & S., 320; Newell on D., S. & L., 890. `It is stated in Odgers on Libel & Slander, 305, 306, that the following *nisi prius* decisions, holding that evidence of a general report that plaintiff had actually committed the particular offense charged by the slanderer, was admissible, must be considered bad law.   [Earl of Liecester v. Walter, 2 Camp. 251; Richard v. Richard, 2 Moo. & Rob. 557; Chalmers v. Shackell, 6 C. & P. 476; Knobell v. Fuller, Peake's Add. Cas. 139.]

But we think it will appear, from the adjudicated cases which we have cited, that the great preponderance of authority is to the effect that in actions of libel and slander, the defendant should be permitted to introduce evidence that the plaintiff's general reputation was bad, in reference to the matters wherein he alleges he is libeled or slandered; and that general rumors, or general report or suspicion of the truth of the libel or slander charged, may be given in evidence by the defendant in mitigation of the damages.   And the reason for this is that the action is for injury to the position and standing of the plaintiff among his fellows, by the utterance or publication of slanders tending to degrade him in their estimation and perhaps expose him to punishment; and the defendant may show that the plaintiff's general reputation is already bad, with a view of showing that no serious injury can have been inflicted upon him.   We are therefore of the opinion that the evidence of character referred to, which was rejected by the court, should have been received; subject, of course, to the limitations and restrictions already sufficently indicated."

The quoted excerpt says that rumors or suspicions of the truth of some particular act alleged in defense of the slander, may be given in proof to mitigate the damages.   The authorities are not unanimous on this point. Some say any specific act of bad conduct by the plaintiff, whether the one alleged as the slander or another, must be both pleaded and proved.   [Anthony v. Stephens,

Moberly v. Preston, supra, 18 Amer. & Eng. Ency. Law
(2 Ed.), p. 1102; 32 Cent. Dig. vol. 2312, sec. 316 and
citations.] This point is not involved in the present case.
Where the slander consisted in imputing a bad charac-
ter to the plaintiff, as that he was a thief, doubtless
proof that he was generally reputed to be such a char-
acter is competent in mitigation. [Nelson v. Wallace,
48 Mo. App. 193, 201.] And this is the doctrine of An-
thony v. Stephens, supra. The point of difficulty is
whether or not evidence should be received that a plain-
tiff's general moral character was bad before the slander
was spoken. In other words, does he put his general
character in issue by instituting a slander suit, or only
that part of it affected by the slander; as was inti-
mated in Anthony v. Stephens? The common rule is that
in civil suits, the character of neither litigant is in is-
sue until it is assailed by his adversary. This means
that a litigant cannot prove his character is good in
order to refute the contention that he was guilty of a
fraud or other tort, or to strengthen his testimony. But
certain actions necessarily involve the question of char-
acter, to some extent; and one of these is an action for
slander. This is because as slander injures reputation as
well as the feelings, the actual damage inflicted by any
slanderous charge depends partly on the reputation of
the person accused. If his reputation is at the lowest
ebb, a slander will not hurt it; and it will be hurt in
proportion to its goodness. But a man's reputation may
be bad in one respect, for instance, intemperance, and
good in other respects; such as honesty and chastity. Ob-
viously his intemperance would not diminish sensibly
the damage done to his reputation by calling him a
thief; and doubtless in an action for such a slander, the
law would exclude evidence of drunken habits if offer-
ed to mitigate damages. But the prevalent rule is that
a plaintiff's general reputation for moral worth is in
issue in every slander suit. [Newell on Libel and Slan-
der p. 890; Townshend, secs. 406 et seq.; 1 Greenleaf

(Lewis Ed.), sec. 55; 18 Amer. & Eng. Ency. Law (2 Ed.), p. 1099, et seq; 37 Cent. Dig. Col. 2085, sec. 160; Leonard v. Allen, 11 Cush. 241.] The question was exhaustively treated in Stone v. Varney, 7 Metc. (Mass.), 86 and Root v. King, 7 Cowan (N. Y. 613), and in both cases the doctrine declared was that public reports of specific acts were inadmissible, but that the plaintiff's generally bad reputation for moral worth could be shown in mitigation. The following cases contain instructive opinions on the point. Clark v. Brown, 116 Mass. 504; Lamos v. Snell, 6 N. H. 413; Springstein v. Field Anthon's N. P. 252; Lowe v. Herald Co., 6 Utah 175; Haag v. Cooley, 33 Jans. 387; Sowers v. Sowers, 87 N. C. 303; Sayre v. Sayre, 25 N. J. L. 235; Sickra v. Small, 87 Maine 493; Bowen v. Hale, 20 Vt. 232; Eastland v. Caldwell, 2 Bibb's 21; Steinman v. McWilliams, 6 Pa. St. 170. The ground of the doctrine is that a person of disparaged reputation cannot be damaged as much by a slander as one of unsullied name. This doctrine was noticed with approval by the Supreme Court of Missouri in Stark v. Pub. Co., 160 Mo. 529. (l. c. 549 & 550), 61 S. W. 669. In the opinion in the case just cited, reference was made to the decisions in Dudley v. McCluer, 65 Mo. 241 and Vawter v. Hultz, 112 Mo. 633, 20 S. W. 689, wherein it was expressly stated that in slander cases, the jury are permitted to consider the plaintiff's character in assessing damages. We therefore rule that evidence touching Yager's general reputation for integrity and moral worth prior to the date of the slander was admissible.

(e) It is insisted that Wilfley should have been permitted to state what Gatewood had said to him regarding the plaintiff's integrity, because it was to Gatewood that defendant made the slanderous statement which is the basis of this action, and if Gatewood himself had been making similar charges against Yager, defendant's statement to him (Gatewood) was likely to do less damage to the plaintiff's reputation than if made to

116 App—32

a person whose opinion of plaintiff's character for integrity was good. On reflection we deem this argument unsound. Whatever Gatewood may have said to Wilfley concerning plaintiff, was spoken when he was not under oath and may have been a hasty expression, not representing his real opinion. If that was true, plaintiff was injured by what defendant said to Gatewood. To prove in that way, that defendant's remark was harmless, would be likely to lead to a wrong conclusion. Gatewood might have been cross-examined regarding his statement to Wilfley and a ground for impeachment laid; but this was not done.

(f) We think it was competent for the defendant to testify that William Sharp had told him of the transaction with the Mexico Savings Bank in which plaintiff is alleged to have stolen five dollars. Of course Sharp's statement would have been no evidence of the truth of the charge, and it would have been proper to so advise the jury. But it was competent to prove the statement of Sharp, on the issue of whether the defendant made the charge that plaintiff was a thief from a malicious motive. If the charge was false, defendant is bound to answer in actual damage to the plaintiff, whatever his motive may have been. But, if the slander was uttered in good faith and in a well-founded belief that it was true, and without express malice, defendant was not liable in punitive damages. It is for this reason that he should have been allowed to state what Sharp had told him. [Lewis v. Humphries, 64 Mo. App. 466; Callahan v. Ingram, 122 Mo. 355, 26 S. W. 1020; Arnold v. Jewett, 125 Mo. 241, 28 S. W. 614; Hatfield v. Lasher, 81 N. Y. 246; Bush v. Prosser, 11 N. Y. 347.]

7. Another assignment of error is that in instructing as to the measure of damages, the court ignored the defendant's plea in mitigation and the evidence introduced to prove it. In support of the position that the court should have referred in the instruction to the defense of mitigation, we are cited to the opinion in Cal-

lahan v. Ingram, 122 Mo. 355, 373, which, in truth, supports this assignment. But in Minter v. Bradstreet Co., 174 Mo. 444 (l. c. pp. 490 to 494), 73 S. W. 668, the Callahan case was overruled as to this proposition, and the rule declared that if a defendant in a libel or slander case is not satisfied with a general instruction regarding compensative and punitive damages, because it leaves out of view the plea in mitigation, he should request an instruction calling the jury's attention to his plea; and if he does not, the general instruction will not constitute error.

The judgment is reversed and the cause remanded. *Bland, P. J.*, and *Nortoni, J.*, concur.